**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Christine M. Arguello**

Civil Action No. 17-cv-02047-CMA

ARTHUR NOREJA,

     Plaintiff,

v.

NANCY A. BERRYHILL, Acting Commissioner of Social Security,

     Defendant.

---

## ORDER AFFIRMING THE DENIAL OF DISABILITY INSURANCE BENEFITS AND SUPPLEMENTAL SECURITY INCOME

---

     This matter is before the Court on review of the Social Security Commissioner's decision denying Plaintiff Arthur Noreja's application for disability insurance benefits, filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401–34, and for supplemental security income, filed pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1382–85.  Jurisdiction is proper under 42 U.S.C. § 405(g).

     Plaintiff argues that the administrative law judge (the "ALJ") failed to comply with an order of remand from the Social Security Administration's Appeals Council and that the ALJ wrongly weighed three sources of opinion evidence.  (Doc. # 15 at 3.)  Because the ALJ's analysis was supported by substantial evidence and because the ALJ used the correct legal standards, the Court rejects Plaintiff's arguments and affirms the decision of the Commissioner.

# I.    BACKGROUND

## A.    PLAINTIFF'S APPLICATIONS AND INITIAL OPINION EVIDENCE

Plaintiff, born July 20, 1967, was 44 years old when his disabilities allegedly began on February 1, 2012.  *See* (Doc. # 11-6 at 415.)[1]  Plaintiff filed applications an application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401–34, and an application for supplemental security income under Title XVI of the Act, 42 U.S.C. §§ 1382–85, on March 27, 2012.[2]  (*Id.* at 415–29.)  Plaintiff alleged that the following physical and mental conditions limited his ability to work: "[s]kull fracture; memory loss; right femur fracture; back; neck; left shoulder; right ankle."[3]  (Doc. # 11-8 at 477.)  On an accompanying pain questionnaire, Plaintiff also complained of headaches "all the time."  (*Id.* at 485–86.)  Plaintiff reported that he worked as an assistant at an animal shelter until February 1, 2012, and had held positions at food service establishments and at a call center in the ten years prior.  (*Id.* at 478.)

Dr. Kent Lofley, D.O., conducted a consultative physical examination on Plaintiff on June 23, 2012.  (Doc. # 11-10 at 642–47.)  Plaintiff complained of worsening memory loss and headaches that he treated with medical marijuana.  (*Id.* at 642.)  Dr.

---

[1] All of the exhibits filed Doc. # 11 constitute the Administrative Record in this matter.  The Court cites to the docket number of the exhibit (*e.g.*, Doc. # 11-6) and the page number from the Administrative Record (*e.g.*, at 415).

[2] Plaintiff previously filed applications for disability insurance benefits and supplemental security income on October 28, 2011, alleging that he became unable to work because of his disabling condition on December 31, 2009.  (Doc. # 11-6 at 300–21.)  The Commissioner denied these applications on December 5, 2011, because she found that Plaintiff was working consistently and earning over the substantial gainful activity level of $1,000.00 per month.  (Doc. # 11-4 at 152–58.)

[3] Though Plaintiff complained of and the ALJ considered a variety of physical ailments, Plaintiff only challenges that ALJ's assessments of his headaches and mental impairments.  *See* (Doc. # 15 at 10–15.)  The Court therefore limits this Order to Plaintiff's headaches and mental impairments.

Lofley observed that Plaintiff was "pleasant, cooperative, and appeared in no acute distress," he "did not appear particularly anxious [or] agitated, . . . and responded appropriately with adequate effort throughout," and his "speech was clear and coherent." (*Id.* at 644.)  Dr. Lofley performed a "mini" mental status examination on Plaintiff with the following results:

> Score 21/30.  One point off for not being able to know the season, 3 points off for not being able to spell the word "world" backwards, 3 points off for not being able to remember 3 objects[,] and 2 points off for not being able to follow the command "close your eyes."  One point off for not being able to write a sentence.

(*Id.* at 647.)  Among Dr. Lofley's diagnoses of Plaintiff were "[m]ild cognitive impairment with associated memory loss with a minimental [sic] status exam score of 21/30" and "history of traumatic brain injury." (*Id.*)  Dr. Lofley's functional assessment of Plaintiff found only physical limitations; he stated that there were "no other relevant visual, communicative[,] or workplace environmental limitations recommended." (*Id.*)

On July 9, 2012, a single decision maker (the "SDM") at the regional Social Security Administration office in Pueblo, Colorado, concluded that Plaintiff was not disabled and denied Plaintiff's applications.  (Doc. # 11-3 at 102–25.)  Relevant here, the SDM determined that Plaintiff did not have communicative limitations.  (*Id.* at 122.)  Also as part of the Administration's initial review, a psychological consultant, Dr. James Wanstrath, Ph.D., reviewed Plaintiff's file and concluded that Plaintiff's alleged affective disorders were "not severe" and that Plaintiff had only "mild" difficulties with activities of daily living and with maintaining concentration, persistence, and pace.  (*Id.* at 119.)  The

Social Security Administration informed Plaintiff that he did not qualify for benefits on July 10, 2012.  (Doc. # 11-4 at 159–64.)

Plaintiff retained attorney Mr. Lawrence D. Saunders on August 3, 2012 (*id.* at 165–67), and on August 9, 2012, Plaintiff requested a hearing before an ALJ (*id.* at 168).  The Administration scheduled a hearing for July 9, 2013.  (*Id.* at 191.)

One of Plaintiff's treating physicians, Dr. Ben Martinez, M.D., provided two assessments of Plaintiff's limitations in the spring of 2013.  First, Dr. Martinez filled out a Med-9 form for the Colorado Department of Human Services in support of Plaintiff's application for state aid on March 25, 2013; on that form, he checked the statement, "I find this individual has been or will be totally and permanently disabled to the extent they are unable to work at any job due to a physical or mental impairment."  (Doc. # 11-10 at 655.)  Second, on May 13, 2013, Dr. Martinez filled out a brief questionnaire[4]  in which he indicated that Plaintiff suffered from daily headaches of 30 minutes to multiple hours and that Plaintiff was prescribed Vicodin, Flexeril, and medical marijuana to treat them.  (*Id.* at 671.)  Dr. Martinez checked off that Plaintiff would not be able to function on a job while headaches occur because Plaintiff would be "unable to concentrate properly" and would have "upset stomach."  (*Id.*)

Dr. Richard Madsen, Ph.D., conducted a psychological evaluation on Plaintiff on June 4, 2013, on a referral from Plaintiff's counsel.  (*Id.* at 659–70.)  Dr. Madsen observed that Plaintiff "appeared to be reliable," "was cooperative[,] and appeared to give an honest effort on test items."  (*Id.* at 659.)  After detailing Plaintiff's account of his

---

[4] The record does not reflect where this questionnaire originated or what its purpose was.

history and impairments,[5] Dr. Madsen reported the following on Plaintiff's "mental status exam":

> The client is oriented to person, place, and time. He was able to recall the year, the month, the day of the month, the day of the week, and the name of the President. Affect is consistent with an anxious mood. Thought processes are nonpsychotic. Short-term memory appears to be poor. Thought content is logical and relevant. . . . His speech was clear and intelligible, but at times, he had trouble finding the words that he wanted to say and tended to stammer. No evidence of present suicidal or homicidal ideation. . . . Level of intellectual functioning is somewhat impaired, probably in the borderline range, possibly lower. His fund of knowledge is impaired. . . . Appears to be reasoning functionally. His judgment indicates he is somewhat impulsive. . . . Persistence and pace were adequate.

(*Id.* at 661–62.)

At counsel's request, Dr. Madsen administered the Wechsler Memory Scale, Fourth Edition ("WMS-IV") assessment and reported that Plaintiff scored "extremely low" across all areas of memory—auditory, visual, visual working, immediate, and delayed memory. (*Id.* at 662.) Dr. Madsen described that Plaintiff's memory index scores on the WMS-IV were all "significantly impaired in the extremely low range, the first percentile and below," indicative of "significant memory impairment." (*Id.*) Dr. Madsen assessed Plaintiff with depressive disorder not otherwise specified ("NOS"), cognitive disorder NOS, post-traumatic stress disorder, and personality disorder NOS. (*Id.* at 663.) He concluded that Plaintiff's "ability to do work-related activities [was] significantly impaired because of cognitive functioning, [and] problems with memory." (*Id.*)

---

[5] Dr. Madsen did not review any of Plaintiff's medical records. (Doc. # 11-10 at 661.)

**B.    THE ALJ'S FIRST HEARING AND DECISION**

ALJ Debra Boudreau conducted a hearing on Plaintiffs' applications on July 9,

2013.  *See* (Doc. # 11-2 at 73–98.)  Plaintiff and an impartial vocational expert, Ms.

Bonnie Martindale, testified, and Plaintiff's counsel was present.  (*Id.* at 73.)  Plaintiff

testified about his daily activities, and when the ALJ asked him about his work

experience, Plaintiff stated, "I have to be told . . . one task at a time. . . .  But if I'm giving

[sic] two, three tasks I have to go back and say, okay, what's next, and they're like well I

just told you.  So that caused a little problem."  (*Id.* at 78–87.)  Plaintiff's counsel asked

about his headaches, and Plaintiff responded that he had headaches "all the time, every

day," and "more than once a day."  (*Id.* at 90.)  The vocational expert categorized

Plaintiff's previous work as requiring "medium" and "heavy" levels of exertion[6] and

testified that a hypothetical individual with Plaintiff's profile and certain physical

limitations would not be able to perform Plaintiff's previous jobs.  (*Id.* at 92–94.)  She

testified that the hypothetical individual would be capable of performing work requiring

"light" exertion,[7] including work as a dry cleaner, a food service worker, a ticket taker, or

a bakery racker.  (*Id.* at 94–96.)

The ALJ issued her decision that Plaintiff was not disabled and not entitled to

disability insurance benefits or supplemental security income on July 23, 2013.  (Doc.

---

[6] With regard to physical exertion, "medium work" is defined as involving "lifting no more than 50
pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  20
C.F.R. § 404.1567(c); 20 C.F.R. § 416.967(c).  "Heavy work" "involves lifting no more than 100
pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds."  20
C.F.R. § 404.1567(d); 20 C.F.R. § 416.967(d)
[7] "Light work" is defined as involving "lifting no more than 20 pounds at a time with frequent
lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(c); 20 C.F.R. §
416.967(c).

# 11-3 at 126-47.)  The ALJ identified that Plaintiff had "severe impairments" of "cognitive disorder, not otherwise specified; and headaches."  (*Id.* at 131.)  Plaintiff had the residual functional capacity ("RFC") to perform medium work, subject to some physical limitations (including avoidance of concentrated exposure to pulmonary irritants), but the ALJ determined that Plaintiff was "able to understand, remember, and carry out simple instructions that can be learned and mastered within 30 days."  (*Id.* at 134.)  The ALJ determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] not credible to the extent they [were] inconsistent with . . . the medical evidence."  (*Id.* at 137.)  In reviewing opinion evidence, she assigned "great weight" to Dr. Lofley's assessment but "little weight" to the medical opinions of Dr. Madsen and Dr. Martinez.  (*Id.* at 138–39.)  Finally, the ALJ relied on the vocational expert's testimony that Plaintiff was capable of working as a food service worker, ticket taker, or bakery racker.  (*Id.* at 141.)

## C.  THE APPEALS COUNCIL'S REMAND AND ADDITIONAL MEDICAL AND OPINION EVIDENCE

On March 11, 2015, the Appeals Council vacated the ALJ's decision and remanded the case for further proceedings.  (*Id.* at 148–51.)  The Appeals Council disagreed with the ALJ's rationale for assigning Dr. Madsen's opinion little weight, explaining that "it [did] not appear Dr. Madsen had to rely on subjective complaints to form his opinion.  The objective exam results show[ed] poor short term memory, trouble finding words, . . . and extremely low memory scores on apparently valid WMS-IV testing."  (*Id.* at 149.)  The Appeals Council held that "[i]f Dr. Madsen's opinion merits less weight based on the manner by which it was obtained, then these results should be

7

confirmed or contradicted by an impartial consultative examination." (*Id.*) The Appeals Council directed the ALJ to, on remand:

> Obtain additional evidence concerning the claimant's mental impairments in order the complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence. The additional evidence should include, if available, a consultative mental examination with psychological testing.

(*Id.* at 149–50) (internal citation omitted).

Before the ALJ took up Plaintiff's case on remand, Plaintiff sought additional medical treatment and submitted supplementary evidence. Plaintiff was seen by a neurologist, Dr. Richard Gumuac, M.D., on Dr. Martinez's referral on June 13, 2013. (Doc. # 11-10 at 672–76.) Plaintiff reported severe headaches and wanted to discuss treatment options. (*Id.* at 672.) Dr. Gumuac completed an electroencephalogram on Plaintiff and determined that the results were "within normal limits" for Plaintiff's age. (*Id.* at 676.) Dr. Gumuac observed that Plaintiff was "in no acute distress" and was "alert and oriented." (*Id.* at 672.)

Records from Southern Colorado Family Medicine (Doc. # 11-11 at 677–714) and Saint Mary Corwin Physician Partnership (*id.* at 715–21) of Plaintiff's visits between September 25, 2014, and August 27, 2015, reflect that Plaintiff repeatedly sought treatment for pain, seizures, and rectal bleeding. (Doc. # 11-11 at 677–714.) Throughout these records, medical providers assessed Plaintiff's psychiatric state as "no stress, no depression" and remarked that he was oriented to person, place, and time and was "appropriate," *e.g.*, (*id.* at 680, 691, 699, 707), though in one instance, the record states that Plaintiff said "that he [was] a cutter and [wanted] to be referred to a

psychiatrist" (*id.* at 712).  There are few, if any, complaints of headaches, and on April

24, 2015, Plaintiff denied having headaches.  (*Id.* at 717.)

Dr. Timothy Papsidero, M.D.,[8] completed another Med-9 form for the Colorado

Department of Human Services on June 30, 2015, and checked the statement, "I find

this individual has been or will be totally and permanently disabled to the extent they are

unable to work at any job due to a physical or mental impairment."  (*Id.* at 722.)  Dr.

Papsidero wrote that Plaintiff's "qualifying disability" was "plate in head, seizure

disorder."  (*Id.*)

Plaintiff started treatment for his psychological impairments in late 2014 and had

weekly individual appointments with a therapist, Ms. Lesli St. John, at Health Solutions

and Spanish Peaks Behavioral Health Clinic until December 28, 2015.  (*Id.* at 739–62,

773–77.)  On Plaintiff's intake assessment, dated November 3, 2014, Ms. St. John

recorded that Plaintiff's chief complaint was anxiety and that he stated he "[didn't] see a

future and [couldn't] work [and] . . . has traumatic brain injury that causes seizures and

headaches."  (*Id.* at 755.)  Ms. St. John checked off on the mental status exam report

that Plaintiff was of "average" intelligence, his speech was "unremarkable" and

"tangential," his associations were intact, his impairment in daily functioning was

"moderate," and that his judgment, attention, insight, short term memory, recent past

memory, and remote past memory were "intact."  (*Id.* at 761.)  She diagnosed Plaintiff

with post-traumatic stress disorder, major depressive disorder-single episode-mild, and

---

[8] The records of Patient's treatment at Southern Colorado Family Medicine suggest that Dr.
Papsidero treated Plaintiff there.  *E.g.*, (Doc. # 11-11 at 705–07.)  Neither Plaintiff nor the ALJ
indicates Dr. Papsidero's relationship, if any, to Plaintiff.

"parent child relational problem."  (*Id.* at 762.)  In the progress notes Ms. St. John took

over the course of their sessions, there are two records of Plaintiff complaining

headaches (*id.* at 747, 750) and three records of Plaintiff discussing his memory issues

(*id.* at 739, 740, 773).

## D.  THE ALJ'S SECOND HEARING AND DECISION

The ALJ held a second hearing on Plaintiff's applications on April 19, 2016.

(Doc. # 11-2 at 37–72.)  Plaintiff, his counsel, an impartial vocational expert, Mr.

Douglas Prutting, and an impartial medical expert, Dr. James Bruce, Ph.D., appeared.[9]

(*Id.* at 37.)  Plaintiff answered the ALJ's questions about the sale of some of his artwork

for $34.00 and how he wanted to use Facebook to sell more art.  (*Id.* at 41–45.)  He

also described why he stopped riding his bicycle and how he went about his days.  (*Id.*

at 47–50.)  He testified that he had a "weird sleeping pattern" and that he was "starting

to lose" his reading and writing skills ("And then a book, I'll pick it up and sometimes I'll

read and read and I have to read it over because I don't understand it.").  (*Id.*)

Dr. Bruce then testified that the evidence suggested mental impairments of a

cognitive disorder/memory impairment, listed at 12.02, and a depressive disorder not

otherwise specified, listed at 12.04.[10]  (*Id.* at 50–58.)  Dr. Bruce explained that Dr.

_____

[9] Dr. Bruce appeared by telephone.  (Doc. # 11-2 at 39.)

[10] The ALJ and Dr. Bruce were referring to the Social Security Administration's Listing of Impairments, 20 C.F.R. § Pt. 404, Subpt. P, App. 1.  The listings "are descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system them affect.  Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results."  *Sullivan v. Zebley*, 493 U.S. 521, 529–30 (1990).

Mental disorders are listed at section 12.00 of the appendix.  20 C.F.R. § Pt. 404, Subpt. P, App. 1.  Each listed mental disorders is defined by two or three paragraphs, designated A, B, and C.  *Id.*  For a listed mental disorder that is defined by only two paragraphs, the claimant's "mental disorder must satisfy the requirements of both paragraphs A and B."  *Id.*  For a listed

Lofley's opinion and Dr. Madsen's opinion supported the diagnosis of a cognitive disorder/memory impairment, but he cast serious doubt upon the validity of Dr. Madsen's opinion. (*Id.* at 51.) Dr. Bruce noted "contradiction" between Dr. Lofley's mini mental status exam and Dr. Madsen's WMS-IV assessment and described Plaintiff's scores on the WMS-IV as "extraordinarily dire." (*Id.* at 51–53.) He stated that he found no other indications of such extreme limitations in the record, that indications of memory issues elsewhere in the record were "more isolated," in "just . . . one document," and that Plaintiff "presented in a way that contradicts the likelihood of all the scales on the [WMS-IV] scale being extremely low." (*Id.* at 53, 56, 59.) Dr. Bruce testified that the paragraph A criteria for a cognitive disorder/memory impairment were "likely present" though "mild, so it would not contribute to meeting" the functional limitation criteria of paragraph B. (*Id.* at 56.) As to a depressive disorder, Dr. Bruce stated that was "probably closer to being listable," as depression was "identified throughout the record." (*Id.* at 54, 57.)

Dr. Bruce testified that Plaintiff could be expected to have functional limitations as a result of these impairments:

> He could be expected to have marked difficulty in dealing with complex, detailed instructions, remembering them, understanding them, carrying them out, and that is an inference I'm making that is not well-supported in the record. We have very little in the record that gives us much insight

---

mental disorder that is defined by three paragraphs, the claimant's mental disorder "must satisfy the requirements of both paragraphs A and B, or the requirements of both paragraphs A and C." *Id.* Paragraph A of each listing is the medical indicators that must be present in the claimant's medical evidence. *Id.* Paragraph B provides the functional criteria the Social Security Administration assesses, in conjunction with a rating scale, to evaluate how the claimant's mental disorder limits his or her functioning. *Id.* Paragraph C, where included, provides the criteria the Administration uses to evaluate "serious and persistent mental disorders." *Id.*

considering the difficulty with the [WMS-IV] in [Dr. Madsen's report] as a whole.

(*Id.* at 57–58.)  Dr. Bruce stated that Plaintiff should be able to perform simple tasks, interact with others, and "tak[e] care of the demands of what he needs to do in order to get through the day."  (*Id.* at 58.)  He clarified that Plaintiff "would do better if placed in the work settings to have minimal contact with coworkers and the public.  Occasional and superficial contact should be no problem."  (*Id.*)

Finally, the ALJ posed a hypothetical question of the impartial vocational expert, Mr. Prutting, describing an individual of Plaintiff's age, education, and vocational profile, with several physical limitations but who "has no other manipulative limits, has no visual, communicative or work place environmental limits."  (*Id.* at 67–68.)  The hypothetical individual could "understand and remember simple instructions that [could] be learned and mastered within 30 days," "sustain concentration, persistence and pace for these instructions over a typical workday and workweek in a low stress environment," and "tolerate supervision, routine work changes, can plan and set simple goals and can travel and recognize and avoid work hazards."  (*Id.* at 68.)  The vocational expert testified that such an individual would not be able to perform Plaintiff's past work.  (*Id.* at 68–69.)  However, the vocational expert stated that there were other occupations the individual could perform, such as food preparer, dry cleaner laundry worker, and construction flagger.  (*Id.* at 69.)

The ALJ issued her second decision—at issue in this Order—on May 31, 2016, and again concluded that Plaintiff is not disabled and not entitled to disability insurance benefits or supplemental security income.  (*Id.* at 8–36.)  She determined that Plaintiff

has severe impairments of "headaches, depressive disorder, and cognitive disorder" but that these impairments do not meet or medically equal the severity of a listed impairment. (*Id.* at 14–17.) To reach that determination, the ALJ considered Plaintiff's reported headaches as a potential neurological disorder, listed at 11.00, and concluded Plaintiff's headaches do not amount to a listed neurological disorder because "there is no evidence of a brain tumor, traumatic brain injury, or that she [sic] experienced any disorganization of motor function due to this impairment." (*Id.* at 16); *see* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 11.00. As to Plaintiff's mental impairments, the ALJ reasoned that they do not satisfy the paragraph B criteria of listing 12.02 (neurocognitive disorders) or of listing 12.04 (depressive, bipolar and related disorders) because Plaintiff has only a mild restriction in activities of daily living, moderate difficulties in social functioning, moderate difficulties in concentrations, persistence, or pace, and has not experienced episodes of decompensation. (*Id.*); *see* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00.

The ALJ next concluded that Plaintiff has the RFC to perform medium work, subject to several physical limitations. (*Id.* at 17.) Relevant here, she held that Plaintiff:

> Has no visual, communicative, or workplace environmental limits; can understand and remember simple instructions that can be learned and mastered within 30 days, can sustain[] concentration, persistence and pace for these instructions over a typical workday and workweek in a low stress environment (low stress environment is defined as no frequent or prolonged social interactions); and in that low stress environment, can tolerate supervision, routine work changes, can plan and set simple goals, and can travel and recognize and avoid work hazards.

(*Id.*) Addressing Plaintiff's subjective complaints, the ALJ explained that the "objective evidence and the reported level of [Plaintiff's] daily activities are generally inconsistent

with his allegations of incapacitating symptoms." (*Id.* at 18.) The ALJ then analyzed the opinion evidence. She assigned Dr. Lofley's assessment "great weight" because he evaluated Plaintiff in-person and his findings are consistent with the overall record. (*Id.* at 21.) Dr. Martinez's two assessments, the medical source statement for the state agency and the headache questionnaire, warranted "no weight," according to the ALJ, because Dr. Martinez "provided no explanation, to include specific symptoms or diagnoses," for his determinations and "the overall evidence does not support such a limitation, as there were no abnormal clinical findings or acute brain abnormalities found through objective imaging." (*Id.* at 22.) The ALJ assigned Dr. Madsen's psychological opinion "little weight," explaining that record does not support the level of limitations Dr. Madsen assessed. (*Id.* at 23–25.) Finally, Dr. Bruce's medical opinion deserved "great weight" because Dr. Bruce "is a mental health specialist" who "evaluated the complete record" and heard Plaintiff's testimony and because he "supported his findings with specific examples in the record," according to the ALJ. (*Id.* at 24–25.)

The ALJ relied on the vocational expert's testimony to conclude that Plaintiff is unable to perform any past relevant work but is capable of performing other jobs that exist in significant numbers in the national economy. (*Id.* at 26–28.) She cited positions as a food preparer, dry cleaner/laundry worker, and construction flagger. (*Id.* at 27.)

Plaintiff requested that the Appeals Council review the ALJ's decision on June 23, 2016. (*Id.* at 6.) Plaintiff's counsel argued in an attachment that (1) the ALJ failed to comply with the order of remand; (2) the ALJ's failure to comply with the order of remand demonstrates bias and a lack of basic due process; (3) Dr. Bruce, the medical

examiner, engaged in unfounded speculation that was accepted by the ALJ; and (4) the ALJ failed to develop the record in regard to work restrictions set by Dr. Bruce.  (Doc. # 11-8 at 552–54.)

The Appeals Council denied Plaintiff's request for review on July 28, 2017.  (Doc. # 11-2 at 1–5.)  Plaintiff's arguments did not provide a basis for changing the ALJ's decision, according to the Appeals Council.  (*Id.* at 1.)  It specifically responded to Plaintiff's arguments that the ALJ failed to comply with its prior order of remand:

> The Appeals Council considered the allegations solely as they related to abuse of discretion.  After reviewing the entire record, including the hearing recording, the Appeals Council determined that the Administrative Law Judge did not abuse his or her discretion in this case and that none of the other reasons in our rules existed to review [Plaintiff's] case.

(*Id.*)  When the Appeals Council declined review, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 404.981; 20 C.F.R. § 416.1481; *see Blea v. Barnhart*, 466 F.3d 903, 908 (10th Cir. 2006).

Plaintiff initiated the action presently before the Court on August 25, 2017.  (Doc. # 1.)  After the administrative record was filed, Plaintiff submitted her Opening Brief on December 4, 2017.  (Doc. # 15.)  The Commissioner responded in support of the ALJ's decision on December 22, 2017 (Doc. # 18), to which Plaintiff replied on January 8, 2018 (Doc. # 19).

## II.    <u>STANDARD OF REVIEW</u>

When reviewing the Commissioner's decision, the Court is limited to determining "whether the findings are supported by substantial evidence and whether the Secretary applied the correct legal standards."  *Pacheco v. Sullivan*, 931 F.2d 695, 696 (10th Cir.

1991); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). First, the Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 217 (1938). "Substantial evidence is more than a scintilla, but less than a preponderance . . . ." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987).

In reviewing the record to make the substantial evidence determination, the Court "may not reweigh the evidence nor substitute [its] judgment for the Secretary's." *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994). In addition, the Court "may not displace the agency's choice between two fairly conflicting views, even though the [C]ourt would justifiably have made a different choice had the matter been before it de novo." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quotation marks and citation omitted). Also, the Court "defer[s] to the ALJ on matters involving the credibility of witnesses." *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994). "A finding of '"no substantial evidence" will be only where there is a "conspicuous absence of credible choices" or "no contrary medical evidence."'" *Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992) (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

Second, in addition to the absence of substantial supporting evidence, "[f]ailure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984); *see also Thompson v. Sullivan*,

987 F.2d 1482, 1487 (10th Cir. 1993). "There are specific rules of law that must be followed in deciding whether evidence is substantial in these disability cases." *Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987).

However, not every error in evaluating evidence or applying the correct legal standard warrants reversal or remand. "Courts may not reverse and remand for failure to comply with a regulation without first considering whether the error was harmless." *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006); *see also Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004) (recognizing that the Tenth Circuit has "specifically applied [the principle of harmless error] in social security disability cases" and collecting cases). Harmless error exists where it is "inconceivable" that a different administrative conclusion would have been reached absent the error. *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003).

## III.    LAW

"Disability" is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . ." 42 U.S.C. § 423(d)(1)(A). The Act further provides that

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial work which exists in the national economy. . . .

42 U.S.C. § 423(d)(2)(A). The claimant bears the burden of proving that he is disabled. 20 C.F.R. § 404.1512(a); *Wall v. Astrue*, 561 F.3d 1048, 1062 (10th Cir. 2009).

The Commissioner has established a five-step sequential evaluation process to determine whether a claimant is disabled. 20 C.F.R. § 416.920(a)(4). The steps of the evaluation are whether: (1) the claimant is currently working; (2) the claimant has a severe impairment; (3) the claimant's impairment meets an impairment listed in Appendix 1 of the relevant regulation; (4) the impairment precludes the claimant from doing her past relevant work; and (5) the impairment precludes the claimant from doing any work. *See* 20 C.F.R. §§ 404.1512(g), 404.1560(c), 416.912(g), 416.960(c); *Pisciotta v. Astrue*, 500 F.3d 1074, 1076 (10th Cir. 2007). A finding that a claimant is or is not disabled at any point in the five-step evaluation process is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Serv.*, 933 F. 2d 799, 801 (10th Cir. 1991).

## IV. ANALYSIS

Plaintiff argues that the ALJ erred in four ways:

I.      The ALJ improperly failed to comply with an order of remand by not obtaining a consultative examination as ordered.
II.     The ALJ did not properly weigh the opinions of the treating physician, Dr. Martinez, as the ALJ gave no weight to his opinions.
III.    The ALJ did not include all of the significant work restrictions by Dr. Bruce, despite giving his opinion great weight.
IV.     The ALJ erred in giving little weight to the opinions of an examining physician, Dr. Madsen.

(Doc. # 15 at 3.) The Court rejects each argument in turn.

## A. REMAND ORDER

In her 2013 decision denying Plaintiff benefits, the ALJ assigned Dr. Madsen's opinion "little weight" for several reasons, including that Dr. Madsen did not have a treating relationship with Plaintiff, he "apparently relied quite heavily on the subjective

reports of symptoms and limitations provided by [Plaintiff]," and he "uncritically

accept[ed] as true most, if not all, of what [Plaintiff] reported." (Doc. # 11-3 at 138–39.)

The ALJ also emphasized that Plaintiff sought out Dr. Madsen "through attorney referral

and in connection with an effort to generate evidence for the current appeal." (*Id.* at

139.)

The Appeals Council subsequently vacated the ALJ's 2013 decision and

remanded the case for further proceedings because it disagreed with the ALJ's

treatment of Dr. Madsen's opinion. (*Id.* at 149.) It wrote that if "Dr. Madsen's opinion

merits less weight based on the manner by which it was obtained, then these results

should be confirmed or contradicted by an impartial consultative examination." (*Id.*)

The Appeals Council directed the ALJ to "[o]btain additional evidence concerning the

claimant's mental impairments" on remand. (*Id.*)

It is undisputed that on remand, the ALJ did not obtain another consultative

mental examination. *See* (Doc. # 18 at 6.) Rather, the ALJ brought in an impartial

medical expert, Dr. Bruce, to review the evidence and listen to Plaintiff's testimony at

the hearing on April 19, 2016. *See* (Doc. # 11-2 at 50.)

After the ALJ issued a second adverse decision on May 31, 2016, (*id.* at 8–36),

Plaintiff requested that the Appeals Council again review the ALJ's decision in part

because the ALJ failed to comply with the Appeals Council's remand order to the extent

that it directed the ALJ to obtain a consultative mental examination with psychological

testing (*id.* at 6–7; Doc. # 11-8 at 552–54). The Appeals Council rejected this request

for review because it determined the ALJ "did not abuse . . . her discretion in this case." (Doc. # 11-2 at 1.)

1.   <u>Legal Principles</u>

The Commissioner's regulations require that where the Appeals Council orders an ALJ to take additional action, the ALJ "**shall** take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order."  20 C.F.R. § 303.977(b) (emphasis added).

2.   <u>Application</u>

Plaintiff contends that "the ALJ was ordered [by the Appeals Council] to have a psychological examination that included objective testing."  (Doc. # 19 at 4.)

However, a review of the Appeals Council's remand order makes clear that it did not order the ALJ to obtain a consultative mental examination; it merely determined that additional evidence was required to support the ALJ's assignment of little weight to Dr. Madsen's opinion.  Specifically, the Appeals Council ordered the ALJ to:

> Obtain **additional evidence** concerning the claimant's mental impairments **in order the complete the administrative record in accordance with the regulatory standards** regarding consultative examinations and existing medical evidence (20 CFR 404.1512-1513 and 416.912-913).  The additional evidence **should include, if available**, a consultative mental examination with psychological testing and medical source statements about what the claimant can still do despite the impairment.

(*Id.* at 149–50) (emphasis added).  The Appeals Council's order thereby left the decision up to the ALJ as to whether she deemed another consultative mental examination with psychological testing necessary.  *See Griffith v. Callahan*, 138 F.3d 1150, 1153 (7th Cir. 1998), *rev'd on other grounds*, *Johnson v. Apfel*, 189 F.3d 561 (7th

Cir. 1999) (holding that a nearly-identical Appeals Council order did not require the ALJ to obtain a consultative mental examination).  She did not.

All that the Appeals Council's remand order required of the ALJ was to "[o]btain additional evidence . . . in order to complete the administrative record in accordance with the regulatory standards."  (Doc. # 11-3 at 149.)  The regulations cited by the Appeals Council, 20 C.F.R. §§ 404.1512–13, 416.912–13, do not require an ALJ to obtain one or more consultative examinations for the claimant.  *E.g.*, 20 C.F.R. § 404.1512(b)(2) ("We **may** ask you to attend one or more consultative examinations at our expense."  (Emphasis added)).  The regulations require only that an ALJ "develop [the claimant's] complete medical history for at least the 12 months preceding the month in which [the claimant] files [his or her] application."  *E.g.*, 20 C.F.R. § 404.1512(b)(1).

The Court is satisfied that on remand, the ALJ obtained additional evidence sufficient to complete the administrative record in accordance with the Social Security Administration's regulations.  As the Court has already recounted, the ALJ consulted an impartial medical expert, Dr. Bruce, for an additional opinion about Plaintiff's mental impairments.  Dr. Bruce reviewed the entirety of the record, listened to Plaintiff's testimony, and knowledgably answered questions from the ALJ and Plaintiff's counsel, and Plaintiff did not raise objections to his testimony.  (Doc. # 11-2 at 50–65.) Additionally, in comparison to the ALJ's 2013 decision (Doc. # 11-3 at 138–39), in the her second decision now before the Court, the ALJ cited several more specific pieces of evidence that do not support the level of limitations that Dr. Madsen described.  *See* (Doc. # 11-2 at 25.)  *See Thomas v. Astrue*, 677 F. Supp. 2d 300, 307 (D.D.C. 2010)

(where an ALJ's order on remand had more details, holding, "Quantity of discussion is not sufficient if it does not satisfy a certain quality of discussion but the Court finds that the necessary consideration has been given and the ALJ has provided enough evidence of record to support the assessed limitations.").

Moreover, the Appeals Council was apparently satisfied that the ALJ complied with its remand order. The Appeals Council unequivocally considered and rejected Plaintiff's argument otherwise when it held that the ALJ "did not abuse . . . her discretion in this case" and denied review of the ALJ's second opinion. (Doc. # 11-2 at 1.) Plaintiff fails to assert a convincing argument for upsetting the Appeals Council's judgment about its own prior order. For these reasons, the Court rejects Plaintiff's first argument.

**B.    DR. MARTINEZ**

As the Court has already described, Dr. Martinez was one of Plaintiff's treating physicians and twice opined on Plaintiff's impairments. (Doc. # 11-10 at 655–58, 671.) On March 25, 2013, Dr. Martinez filled out a Med-9 form for Plaintiff's application for state aid and checked off the statement (of five choices) that the individual (Plaintiff) was "totally and permanently disabled to the extent they are unable to work at any job." (*Id.* at 655.) On May 13, 2013, Dr. Martinez completed a one-page questionnaire about Plaintiff's reported headaches and indicated that Plaintiff would not be able to function on a job when he experienced headaches. (*Id*. at 671.)

The ALJ afforded no weight to Dr. Martinez's assessments. (Doc. # 11-2 at 22.) She explained:

> Notably, while a treating source, he provided no explanation to include specific symptoms or diagnoses, for his March 2013 finding that the

claimant was totally disabled.  Further, while he offered more of an
explanation of his May 2013 headache questionnaire, the overall evidence
does not support such a limitation as there were no abnormal neurological
clinical findings or acute brain abnormalities found through objective
imaging.

(*Id.*)  The ALJ cited to various treatment records and radiology reports of CT scans as

evidence contradictory to Dr. Martinez's opinions.  (*Id.*); *see* (Doc. # 11-11 at 677–714,

723–24, 738.)

      1.   <u>Legal Principles</u>

      20 C.F.R. § 404.1527(c) (2013),[11] regarding claims filed before March 27, 2017,

codifies the Commissioner's assessment of medical opinions received into evidence.[12]

*See also* 20 C.F.R. § 416.927(c) (2013); SSR 96-2p (2013).  20 C.F.R. § 404.1527(c)(2)

states a presumption that the Commissioner will give more weight to the medical

opinion of a treating source.  This regulation dictates that the Commissioner will give a

treating source's medical opinion controlling weight if it is well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the

other substantial evidence in the record.  Where an ALJ does not assess a treating

source's opinion controlling weight, 20 C.F.R. § 404.1527(c) requires that the ALJ apply

the factors listed in its paragraphs (c)(2) through (c)(6) to determine the weight to give

the treating source's medical opinion and all other medical opinions.

---

[11] 20 C.F.R. § 404.1527 was updated in 2017, effective March 27, 2017.  Because Plaintiff's
action was filed in 2012, the Court uses the prior version of the regulation, which was in place
between 2012 and 2017.  All citations to the regulation in this Order are to the 2013 version of
20 C.F.R. § 404.1527.
[12] 20 C.F.R. §§ 404.1527(c) and 416.927(c) are identical substantively, and apply to respective
medical opinion assessments in disability and supplemental disability income determinations.

An ALJ must both identify the weight accorded to the opinion of a treating source and also "give good reasons" for the weight assigned to a treating source's opinion. *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003); *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004). The ALJ's explanation must be sufficiently specific to make clear to any subsequent reviewers both the weight given to the medical opinion and the reasons therefor. *Watkins*, 350 F.3d at 1300. Finally, if the ALJ rejects the treating source's opinion completely, he or she "must give 'specific, legitimate reasons' for doing so." *Id.* at 1301 (citing *Miller v. Chater*, 99 F.3d 972, 976 (10th Cir. 1996)).

      2.   <u>Application</u>

Plaintiff characterizes the ALJ's decision as "giving no weight" to Dr. Martinez's assessments because the ALJ made a "finding . . . that there was no objective evidence to support his May 2013 headache questionnaire." (Doc. # 15 at 12.) This finding, according to Plaintiff, "does not justify giving no weight to Dr. Martinez's opinion." (*Id.*) Plaintiff asserts that the absence of objective evidence about Plaintiff's headaches "is irrelevant because the ALJ herself made a specific finding that the Plaintiff did in fact suffer a severe impairment due to his headaches." (*Id.*)

The ALJ's assignment of "no weight" to Dr. Martinez's assessments was based on substantial evidence, and the ALJ adequately explained why such a weighting was appropriate. She accurately stated that Dr. Martinez "provided no explanation," including any specific symptoms or diagnoses, for his conclusion that Plaintiff was totally disabled on the Med-9 form and that Dr. Martinez's opinion on the headache questionnaire was not supported by the overall evidence. *See* (Doc. # 11-2 at 22.) She

thereby implicitly addressed the two reasons why a treating source's opinion may not be

afforded controlling weight. *See* 20 C.F.R. § 404.1527(c)(2) (A treating source's opinion

is given controlling weight where it is "well-supported by medically acceptable clinical

laboratory diagnostic techniques and is not inconsistent with the other substantial

evidence in [the] case record."). The ALJ's explanation also implicitly addressed four of

the other factors relevant to deciding the weight of a medical opinion: the examining

relationship; the treating relationship; supportability; and consistency. *See* (Doc. # 11-2

at 22); 20 C.F.R. § 404.1527(c)(1)–(4). The Court is therefore satisfied that the ALJ

properly gave specific, legitimate reasons for rejecting Dr. Martinez's opinion

completely, *see Watkins*, 350 F.3d at 1301, and her reasons were supported by

substantial evidence. *See Allison v. Heckler*, 711 F.2d 145, 148 (10th Cir. 1983) (where

a treating physician's opinion is "unacceptably brief and conclusory," it may not be

entitled to more weight than the opinion of a non-examining source).

To the extent Plaintiff argues that "it [made] no logical sense for the ALJ to find

that the Claimant had a severe impairment due to his headaches, while rejecting all of

Dr. Martinez's opinion, based on a finding that there was no objective evidence for

those headaches," (Doc. # 19 at 7), the Court rejects this argument because it confuses

the five distinct steps of the Commissioner's sequential evaluation process. *See* 20

C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4).

The ALJ determined that headaches are one of Plaintiff's "severe impairments" at

the second step of the sequential analysis. (Doc. # 11-2 at 13–14.) At step two, the

burden is on the claimant, but the claimant need only make a *de minimis* showing of

medical severity.  *Brant v. Barnhart*, 506 F. Supp. 2d 476, 481 (D. Kan. 2007) (quoting *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988)).  The claimant must be able to show at this step that the impairment has more than a minimal effect on his or her ability to do basic work activities.  *Id.*; *see also* 20 C.F.R. § 404.1520(c); 20 C.F.R. § 416.920(c); SSR 85-28.

The ALJ discounted Dr. Martinez's opinion on the headache questionnaire when determining Plaintiff's RFC, a prerequisite to the fourth step of the sequential analysis— a determination with standards completely different from those applied to a finding at step two.  (Doc. # 11-2 at 17–22); *see* 20 C.F.R. § 404.1545; 20 C.F.R. § 416.945; SSR 96-8p.  An ALJ bears the burden of determining a claimant's RFC "based on **all** of the relevant evidence in the case record," and the ALJ must satisfy rigorous narrative discussion requirements, such as explaining "how any material inconsistencies or ambiguities in the case record were considered and resolved."  SSR 96-8p; *Brant*, 506 F. Supp. 2d at 485–86.  The ALJ's burden to establish the claimant's RFC is therefore much higher than the claimant's burden at step two.  Accordingly, a finding that a claimant has a severe impairment at step two does not necessitate a finding of a limitation when the ALJ determines the claimant's RFC at step four.  The Court rejects Plaintiff's argument that the ALJ's decision in this case made "no sense whatsoever." *See* (Doc. # 19 at 7.)

For these reasons, the Court concludes that the ALJ's assignment of zero weight to Dr. Martinez's brief assessments was based on substantial evidence and employed the correct legal standards.

**C.    DR. BRUCE**

Dr. Bruce, the impartial medical expert, testified that Plaintiff was able to perform simple tasks and interact with others, "[]though he would do better if placed in work settings to have minimal contact with coworkers and the public.  Occasional and superficial contact should be no problem."  (Doc. # 11-2 at 59.)  When the ALJ asked Dr. Bruce to "rate the severity" of Plaintiff's impairments as they were listed on Dr. Madsen's Residual Functional Capacity Evaluation (Mental) form (Doc. # 11-10 at 669–70), Dr. Bruce stated that Plaintiff's ability to make simple work-related decisions was "slight[ly] to moderate[ly]" impaired; that his ability to accept instructions and respond appropriate was moderately impaired; that his ability to get along with coworkers without distracting them or exhibiting behavioral extremes was slightly impaired; that his ability to maintain socially appropriate behavior was slightly impaired; and that Plaintiff's ability to respond appropriately to changes in a work setting was moderately impaired.  (Doc. # 11-2 at 63–65.)

The ALJ assigned Dr. Bruce's opinion "great weight."  (*Id.* at 25.)  She determined that Plaintiff has the RFC, relevant here, to "understand and remember simple instructions that can be learned and mastered within 30 days" and to "tolerate supervision [and] routine work changes" in a "low stress environment," which she defined as one with "no frequent or prolonged social interactions."  (*Id.* at 17.)

1.    Legal Principles

An ALJ is responsible for reviewing the evidence and making findings of fact and conclusions of law.  20 C.F.R. § 404.1527(e)(2) (2013); 20 C.F.R. § 416.927(e)(2)

(2013).  The determination of a claimant's RFC is one such finding of fact reserved for the ALJ.  SSR 96-5p.  While the ALJ "must always carefully consider medical source opinions" about this issue, the ultimate determination is reserved for the ALJ.  *Id.*; *Howard v. Astrue*, 379 F.3d 945, 949 (10th Cir. 2004) ("[T]he ALJ, not a physician, is charged with determining a claimant's RFC from the medical record.").  Additionally, "there is no requirement . . . for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question."  *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012) (citing *Howard*, 379 F.3d at 949; SSR 96-5p).  The only requirement is that the ALJ "consider findings and other opinions" as opinion evidence in accordance with the Commissioner's regulations at 20 C.F.R. § 404.1527 and 20 C.F.R. § 416.927.  20 C.F.R. § 404.1527(e)(2)(i).

      2.    <u>Application</u>

Plaintiff argues that the ALJ failed to incorporate into Plaintiff's RFC "all of the significant work restrictions" Dr. Bruce testified about, despite giving his opinion great weight.  (Doc. # 15 at 12–13.)  First, he states that the ALJ's finding "that [he] can tolerate routine work changes" was "inconsistent with Dr. Bruce's opinion that [Plaintiff] was moderately limited in his ability to respond to changes in the work place."  (*Id.* at 13.)  Second, Plaintiff asserts that the ALJ's finding that he "can sustain concentration, persistence and pace over a typical workday" was "inconsistent with Dr. Bruce's opinion that [Plaintiff] was moderately limited in his ability to accept instructions and respond appropriately."  (*Id.*)  Third, Plaintiff contends that the ALJ also "failed to incorporate the limitation of only being able to deal with occasional and superficial contact."  (*Id.*)

Plaintiff's arguments are unpersuasive. The ALJ's determination of Plaintiff's RFC was based on substantial evidence—including substantial evidence from Dr. Bruce's testimony. There is no dissonance between the ALJ's assignment of great weight to Dr. Bruce's testimony (Doc. # 11-2 at 24–25) and her conclusion about Plaintiff's RFC (*id.* at 17). For example, the ALJ determined that Plaintiff is suited to work in a "low stress environment, . . . defined as no frequent or prolonged social interactions." (*Id.*) This wholly incorporated Dr. Bruce's testimony that Plaintiff "would do better if placed in the work settings to have minimal contact with coworkers and the public. Occasional and superficial contact should be no problem." (*Id.* at 58.) The ALJ's focus on "simple instructions," a low stress environment, "routine" work changes, and "simple" goals in Plaintiff's RFC similarly reflected Dr. Bruce's testimony about Plaintiff's moderate limitations in some areas of functioning. (*Id.* at 17, 57–58.) It is obvious on the face of the ALJ's decision that the ALJ considered Dr. Bruce's opinion in accordance with the applicable regulations, and, as the Court has already explained, "there is no requirement . . . for a direct correspondence between an RFC finding and a specific medical." *Chapo*, 682 F.3d at 1288.

## D.  DR. MADSEN

As the Court previously recounted, Dr. Madsen conducted a psychological examination on Plaintiff on June 4, 2013, at the request of Plaintiff's counsel. (Doc. # 11-10 at 659–70.) Dr. Madsen opined on at length about the results of Plaintiff's mental status exam and the WMS-IV assessment. (*Id.* at 661–62.) He described Plaintiff's "intellectual functioning" as "somewhat impaired" and Plaintiff's memory index

scores on the WMS-IV as "significantly impaired in the extremely low range, the first percentile and below," indicative of "significant memory impairment." (*Id.*)

In explaining her RFC analysis, the ALJ afforded Dr. Madsen's opinion little weight. (Doc. # 11-2 at 22–25.) After summarizing Dr. Madsen's findings in two lengthy paragraphs, the ALJ explained that the findings merited little weight because "the overall record does not support the level of limitation assessed." (*Id.* at 25.) The ALJ cited to "clinical findings" that "revealed no more than a mild cognitive impairment and intact judgment, attention, insight, and . . . memory" and to "treatment notes" that did not evidence any concerns about Plaintiff's decision-making capabilities. (*Id.*)

1.    Legal Principles

The Court already described the applicable regulations when it addressed Plaintiff's argument about the ALJ's treatment of Dr. Martinez's opinion. Briefly, 20 C.F.R. § 404.1527(c) (2013), 20 C.F.R. § 416.927(c) (2013), and SSR 96-2p (2013) provide that an ALJ considers six factors in deciding the weight to assign any medical opinion. Among these are the examining relationship ("Generally, we give more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you") and consistency ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give that medical opinion"). 20 C.F.R. § 404.1527(c)(1), (4).

2.    Application

Plaintiff's final argument is that the ALJ erred in assigning Dr. Madsen's opinion little weight. (Doc. # 15 at 13–15.) He contends that the ALJ's reason for rejecting Dr.

Madsen's opinion—which he describes as her finding that "Plaintiff's mental impairment [is] mild"—was "not supported by evidence in the record."  (*Id.* at 14.)  Plaintiff notes that Dr. Madsen was the only medical source "who [did] any objective testing," and reasons that the record is therefore "entirely void of any counter psychological testing that would call Dr. Madsen's test results into question."  (*Id.*)

Substantial evidence supports the ALJ's assignment of little weight to Dr. Madsen's assessment and her reasoning that "the overall record does not support the level of limitation" Dr. Madsen.  For example, Dr. Lofley's consultative examination In June 2012 showed only a "[m]ild cognitive impairment" in Plaintiff.  (Doc. # 11-10 at 647.)  Ms. St. John's intake conversation and mental status exam with Plaintiff in November 2014 led her to opine that Plaintiff was of "average" intelligence, and that his judgment, attention, insight, short term memory, recent past memory, and remote past memory were "intact."  (Doc. # 11-11 at 761.)  These opinions and other medical records are undoubtedly "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" that Dr. Madsen's opinion was inconsistent with the record.  *See Consol. Edison Co. of N.Y.*, 305 U.S. at 217.  They are far more than a scintilla of evidence.  *See Campbell*, 822 F.2d at 1521.  Moreover, the ALJ's discussion of this evidence reflects consideration of Dr. Madsen's examining relationship and the supportability of his findings, two of the relevant factors bearing on the ALJ's assessment of Dr. Madsen's opinion.  *See* 20 C.F.R. § 404.1527(c)(1), (4).

The Court therefore concludes that the ALJ's assignment of little weight to Dr. Madsen's outlier opinion was based on substantial evidence and employed the correct legal standards.

## V.     CONCLUSION

For the foregoing reasons, it is hereby ORDERED that the May 31, 2016, written decision of the administrative law judge is AFFIRMED.

DATED:  July 23, 2018

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge